**CAPITAL CASE**

No. 24-_____

In the

# United States Court of Appeals
### for the Fifth Circuit

IN RE RODNEY REED,

*Movant.*

## MOTION FOR AN ORDER AUTHORIZING THE DISTRICT COURT TO CONSIDER A SECOND PETITION FOR A WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2244

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Raza Rasheed
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
300 South Grand Ave., St. 3400
Los Angeles, CA 90071

Barry C. Scheck
Jane Pucher
THE INNOCENCE PROJECT
40 Worth St., Ste. 701
New York, NY 10013

George Kendall
Nicola Cohen
SQUIRE PATTON BOGGS (US) LLP
1211 Ave. of the Americas, 26th Fl.
New York, NY 10036

Parker Rider-Longmaid
  *Counsel of Record*
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
parker.rider-longmaid@skadden.com

Cliff C. Gardner
Sarah Runnells Martin
Michelle L. Davis
Gregory P. Ranzini
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King St.
Wilmington, DE 19801

Andrew F. MacRae
MACRAE LAW FIRM PLLC
3267 Bee Cave Rd., Ste. 107, PMB 276
Austin, TX 78746

*Counsel for Movant Rodney Reed*

# CERTIFICATE OF INTERESTED PERSONS

*In re Rodney Reed*, No. 24-_____

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

## I.     Parties

The Movant is Rodney Reed. The Respondent is the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.

## II.    Interested parties

### A.     Counsel for Movant

Counsel for Movant in the litigation are:

- Parker Rider-Longmaid, Cliff C. Gardner, Sarah Runnells Martin, Raza Rasheed, Michelle L. Davis, Gregory P. Ranzini, and Jeremy Patashnik; Skadden, Arps, Slate, Meagher & Flom LLP

- George Kendall and Nicola Cohen, Squire Patton Boggs (US) LLP

- Barry C. Scheck and Jane Pucher, The Innocence Project

- Andrew F. MacRae, MacRae Law Firm, PLLC

- Quinncy McNeal, Husch Blackwell LLP

**B.** **Counsel for Respondent**

Counsel for Respondent in the litigation is:

- Travis Bragg, Office of the Attorney General of Texas

**C.** **Other interested parties**

To counsel's knowledge, there are no additional firms or persons with an interest in the outcome of the litigation.


Dated: June 28, 2024         */s/ Parker Rider-Longmaid*
Parker Rider-Longmaid

*Counsel for Movant Rodney Reed*

# STATEMENT OF RELATED CASES

1.     This case is related to *In re Reed*, No. 19-51044 (5th Cir.), in which the Court dismissed Reed's motion to authorize the district court to consider a second petition for a writ of habeas corpus, pending Reed's exhaustion of the proposed claims in state court. Reed then returned to the Texas courts, asserting claims he could not have discovered earlier through reasonable diligence, as explained below. The Texas Court of Criminal Appeals denied relief. Reed now returns to this Court seeking authorization for the district court to consider his second petition for a writ of habeas corpus raising several of those claims.

2.     In another related case currently pending before the Court, Reed seeks access to DNA testing under 42 U.S.C. § 1983 to prove his innocence. *See Reed v. Goertz*, No. 19-70022 (5th Cir.). In that appeal, Reed explains that Texas' DNA-testing statute (Article 64 of the Texas Code of Criminal Procedure), as authoritatively construed by the Texas Court of Criminal Appeals, violates due process. This Court had initially affirmed the district court's dismissal of the suit as untimely, *Reed v. Goertz*, 995 F.3d 425, 430-31 (5th Cir. 2021), but the Supreme Court reversed and remanded, *Reed v. Goertz*, 598

U.S. 230, 237 (2023). Briefing on remand is complete, and oral argument is scheduled for August 6, 2024.

**3.** In the U.S. Supreme Court, Reed has a pending petition for a writ of certiorari, challenging the Texas Court of Criminal Appeals' June 28, 2023, decisions denying Reed relief on his tenth and eleventh state habeas petitions. *See Reed v. Texas*, No. 23-569 (U.S.). Filed in November 2023, that cert petition presents two constitutional questions: (i) whether the Court of Criminal Appeals applied the wrong gateway-innocence standard under *Schlup v. Delo*, 513 U.S. 298 (1995), and (ii) whether the Texas trial court violated due process by rubberstamping the state's error-riddled findings of fact and failing to conduct its own independent review of the record.

**4.** On December 22, 2023, Reed moved in federal district under Federal Rule of Civil Procedure 60 to vacate the court's final judgment denying Reed's first federal petition for a writ of habeas corpus. *Reed v. Lumpkin*, No. 1:02-cv-00142 (W.D. Tex.) (Doc. No. 208). As the motion explains, recent developments have revealed that the state engaged in misconduct in the underlying federal proceedings, undermining a fair opportunity for habeas relief. The district court has not yet ruled on that motion.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .......................................................i

STATEMENT OF RELATED CASES ................................................................ iii

TABLE OF AUTHORITIES................................................................................ ix

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT .......................................................................5

STATEMENT OF THE ISSUE ..............................................................................6

STATEMENT OF THE CASE................................................................................6

    A.    Reed is convicted in 1998 and has vigorously sought to prove his innocence since.................................................................6

        1.    The state begins investigating Stites' murder......................6

        2.    The state's theory at trial.........................................................8

        3.    Reed files his first federal habeas petition, and this Court denies relief..................................................................10

        4.    In 2019, before his then-scheduled execution, Reed seeks relief from this Court and files a new state habeas petition........................................................................12

    B.    Newly discovered evidence of Reed's innocence—and of the state's additional constitutional violations—comes to light before and during the 2021 evidentiary hearing. ...............14

        1.    The state failed to disclose that witnesses had told investigators that Reed and Stites were connected..........15

        2.    Reed discovers that the state used false factual testimony at his trial. ...........................................................19

3.    The state failed to disclose that witnesses had information implicating Fennell. ........................................20

4.    Reed discovers the state's use of false forensic testimony at his trial. ..............................................27

C.    Reed now asks this Court to authorize the district court to consider his second federal habeas petition. ...............................29

1.    Reed's proposed second petition asserts *Brady* and *Napue* claims. ..............................................29

2.    Reed exhausted his claims in state court. ...........................30

SUMMARY OF ARGUMENT ...............................................................31

LEGAL STANDARD ...............................................................................35

ARGUMENT ............................................................................................38

A.    Reed did not present the claims in his proposed second habeas petition in his prior federal habeas petition, so they are not barred by 28 U.S.C. § 2244(b)(1). ..............................39

B.    Reed could not have discovered the factual predicates for these claims earlier through the exercise of due diligence, and the claims are timely. ..............................................41

1.    Reed could not have discovered the factual predicates for his *Brady* claims any earlier. ........................41

2.    Reed could not have discovered the factual predicates for his *Napue* claims any sooner. ......................44

3.    Reed's claims are timely. ......................................46

# TABLE OF CONTENTS
(continued)

C. If proven, the facts underlying Reed's claims establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty...................................................................................47

    1. But for the state's *Brady* and *Napue* violations, the jury would have heard that Reed and Stites were acquainted and flirting before the murder........................48

    2. But for the state's *Brady* violations, the jury would have heard evidence that Fennell acted violently toward Stites, knew about her affair with Reed, and had made inculpatory remarks after her death.................50

    3. But for the state's *Napue* violations, the jury would not have heard false testimony that Stites was sexually assaulted and that Reed's sperm was deposited around the time of her death. ...........................52

    4. But for each of the constitutional violations, no reasonable juror would have convicted Reed; but for all of the violations, the state would have had no case left...................................................................54

D. Reed's claims will succeed on the merits—although he need not make that showing at this stage. ...................................56

    1. Reed's *Brady* claims will succeed.........................................56

    2. Reed's *Napue* claims will succeed........................................58

    3. The CCA's resolution of Reed's claims is not entitled to deference under 28 U.S.C. § 2254(d). ..............61

CONCLUSION .................................................................................64

# TABLE OF CONTENTS
## (continued)

**Page**

CERTIFICATE OF COMPLIANCE ....................................................................65

CERTIFICATE OF CONFERENCE ...................................................................66

CERTIFICATE OF SERVICE ............................................................................67

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Banks v. Dretke,*
540 U.S. 668 (2004) ................................................................. 41, 42

*Boyd v. French,*
147 F.3d 319 (4th Cir. 1998) ....................................................... 59, 60

*Brady v. Maryland,*
373 U.S. 83 (1963) ........................................................ 1, 3, 4, 10, 14,
.................................................................... 29, 30, 31, 32, 33,
.................................................................... 34, 35, 37, 39, 40, 41, 43,
............................................................ 48, 50, 54, 56, 57, 58, 60, 61

*Emerson v. Johnson,*
243 F.3d 931 (5th Cir. 2001) ....................................................... 33, 46

*Ex parte Reed,*
271 S.W.3d 698 (Tex. Crim. App. 2008) .................................... 6, 7, 8

*Ex parte Reed,*
670 S.W.3d 689 (Tex. Crim. App. 2023) ............................. 13, 14, 31, 50, 62

*Ex parte Reed,*
No. WR-50,961-11, 2023 WL 4234348
(Tex. Crim. App. June 28, 2023) ....................................... 14, 30, 61

*Fisher v. Texas,*
169 F.3d 295 (5th Cir. 1999) ....................................................... 61, 62

*Floyd v. Vannoy,*
894 F.3d 143 (5th Cir. 2018) ....................................................... 56, 57

*In re Cathey,*
857 F.3d 221 (5th Cir. 2017) ................................... 3, 4, 31, 36, 37, 38

*In re Swearingen,*
556 F.3d 344 (5th Cir. 2009) ............................................. 36, 37, 56

*In re Will,*
970 F.3d 536 (5th Cir. 2020) ................................... 36, 37, 38, 41,
.................................................................... 42, 43, 44, 47, 55

*Jackson v. Brown*,
   513 F.3d 1057 (9th Cir. 2008) ................................................................. 54, 60

*Koch v. Puckett*,
   907 F.2d 524 (5th Cir. 1990) ..............................................................................59

*Kopycinski v. Scott*,
   64 F.3d 223 (5th Cir. 1995) ...............................................................................54

*Kyles v. Whitley*,
   514 U.S. 419 (1995) ...................................................................................... 56, 57

*Lawrence v. Florida*,
   549 U.S. 327 (2007) ............................................................................................46

*McQuiggin v. Perkins*,
   569 U.S. 383 (2013) ............................................................................................62

*Napue v. Illinois*,
   360 U.S. 264 (1959) ........................................................... 1, 3, 4, 10, 14,
   ................................................................................... 29, 30, 31, 32, 33,
   ................................................................................... 34, 35, 39, 40, 44, 45,
   ................................................................... 48, 52, 54, 56, 58, 59, 60, 61

*Reed v. Stephens*,
   739 F.3d 753 (5th Cir. 2014) .........................................................................8, 11

*Reed v. Texas*,
   140 S. Ct. 686 (2020) ...........................................................................................5

*Reed v. Thaler*,
   No. 1:02-cv-00142, 2012 WL 2254217
   (W.D. Tex. June 15, 2012) ......................................................... 10, 11, 12, 39, 40

*Schlup v. Delo*,
   513 U.S. 298 (1995) ............................................................................................62

*Strickler v. Greene*,
   527 U.S. 263 (1999) ............................................................................................56

*United States v. Brumfield,*
89 F.4th 506 (5th Cir. 2023)...................................................... 56, 57, 58

*United States v. MMR Corp.,*
954 F.2d 1040 (5th Cir. 1992) ..................................................58

*United States v. O'Keefe,*
128 F.3d 885 (5th Cir. 1997) ...................................................58

*Wedra v. Thomas,*
671 F.2d 713 (2d Cir. 1982) ....................................................59

**CONSTITUTION AND STATUTES**

U.S. Const. amend. V .............................................................1, 26

U.S. Const. amend. XIV ...........................................................58

28 U.S.C. § 2244(b)...................................................... 1, 3, 4, 36,
.................................................................... 57, 58, 60, 61, 62

    28 U.S.C. § 2244(b)(1) ........................................... 4, 31, 38, 39

    28 U.S.C. § 2244(b)(2) ................................................... 35, 36

    28 U.S.C. § 2244(b)(2)(B) .......................................... 35, 36, 37

    28 U.S.C. § 2244(b)(2)(B)(i) ....................................... 4, 31, 37, 38

    28 U.S.C. § 2244(b)(2)(B)(ii) ...................................... 4, 31, 37, 38,
    .................................................................. 39, 48, 54, 57, 58

    28 U.S.C. § 2244(b)(3) .................................................. 3, 5, 35

    28 U.S.C. § 2244(b)(3)(A) ..............................................5, 46

    28 U.S.C. § 2244(b)(3)(B) ...................................................5

    28 U.S.C. § 2244(b)(3)(C) ............................................. 35, 36

    28 U.S.C. § 2244(b)(3)(D) ...................................................5

    28 U.S.C. § 2244(b)(4) .....................................................36

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

28 U.S.C. § 2244(d) ....................................................................................41

   28 U.S.C. § 2244(d)(1)(D) ............................................................... 33, 46

   28 U.S.C. § 2244(d)(2) ...................................................................... 33, 46

28 U.S.C. § 2254 ........................................................................................35

   28 U.S.C. § 2254(d) ............................................................... 35, 56, 61, 62

   28 U.S.C. § 2254(d)(1) ...................................................................... 62, 63

   28 U.S.C. § 2254(d)(2) ................................................................. 35, 62, 63

**INTRODUCTION**

Rodney Reed—who was sentenced to death in Texas state court over 25 years ago for a crime he did not commit—moves for an order authorizing the district court to consider his proposed second federal petition for a writ of habeas corpus. Reed's petition alleges that the state failed to disclose exculpatory evidence, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and solicited false testimony, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959). Reed is entitled to proceed in district court because he has made the requisite prima facie showings under 28 U.S.C. § 2244(b). Most importantly, he has shown that, but for these constitutional violations, any reasonable juror would have had reasonable doubt about his guilt.

**1.** Reed was convicted in 1998 of murdering Stacey Stites. Stites had been engaged to Jimmy Fennell, Jr., a police officer and purportedly the last person who saw Stites alive. Although Fennell proved deceptive on polygraph tests and at first invoked the Fifth Amendment, investigators didn't even search the apartment he shared with Stites and instead charged Reed.

The state's case relied primarily on sperm with DNA matching Reed's found in Stites' vaginal tract. Reed, who is Black, protested his innocence, admitting that he was having an affair with Stites, who was white, as is

Fennell. The state's theory depended on two crucial strands. First, the state's forensic witnesses testified that sperm could remain intact for only 26 hours and that Stites was sexually assaulted around the time of her death. Second, the state said that it had searched everywhere for witnesses who knew about the relationship between Reed and Stites but came up empty. The state, thus, argued that Reed's sperm must have been deposited around the time of Stites' death, so the only explanation was that he raped and murdered her. An all-white jury convicted Reed and sentenced him to death.

**2.**   Reed has been fighting to prove his innocence for a quarter century. In 2021, at a Texas trial-court evidentiary hearing on his state habeas claims, Reed presented evidence that dismantled the state's case against him. What's more, before and during the hearing, Reed learned of new constitutional violations the state had committed.

*First*, investigators *had* found witnesses—three of Stites' coworkers—who had firsthand knowledge of or had heard rumors that Stites and Reed knew each other. The state didn't disclose that exculpatory information until 2021.

*Second*, based on those disclosures, Reed discovered that prosecutors had solicited false trial testimony from investigators, who had told the jury they hadn't uncovered any evidence that Stites and Reed were associated.

*Third*, Reed discovered that police and prosecutors had known about evidence implicating Fennell. Fennell's neighbor told a district attorney that Fennell constantly fought with and was aggressive toward Stites. Fennell had told a friend and fellow officer before the murder that Stites was "fucking a n****r." And another officer heard Fennell say at Stites' funeral that "she got what she deserved." The state never disclosed that evidence.

*Fourth*, the state's experts at the 2021 evidentiary hearing *admitted* that key forensic testimony the state offered at trial was false. Contrary to what the state's witnesses told the jury, sperm can survive for days—not just 26 hours. And the state's testimony explaining that Stites was raped as she was murdered was false, too.

**3.** Reed asks this Court for an order under § 2244(b)(3) authorizing the district court to consider his proposed second federal habeas petition, so that he can bring *Brady* and *Napue* claims stemming from these newly discovered constitutional violations. The Court "must grant" the motion if "it appears 'reasonably likely'" that Reed has satisfied the three requirements

of § 2244(b). *In re Cathey*, 857 F.3d 221, 226-27 (5th Cir. 2017). Reed has carried that burden.

*First*, Reed did not present the claims in his proposed second petition in his initial federal petition, so these claims aren't barred by 28 U.S.C. § 2244(b)(1).

*Second*, Reed couldn't have discovered the factual predicates underlying his *Brady* or *Napue* claims earlier. *See id.* § 2244(b)(2)(B)(i). Indeed, the prosecutors affirmatively represented that this exculpatory evidence didn't exist. And Reed couldn't have discovered that the state *knowingly* solicited false testimony at his trial until the state's experts agreed at the 2021 hearing that the challenged testimony was false.

*Third*, the facts underlying Reed's claim (which the Court assumes to be true at this stage) show "by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found" Reed guilty. *Id.* § 2244(b)(2)(B)(ii). Indeed, if the improperly withheld evidence had been submitted to the jury and the false testimony had been corrected, the state's case against Reed would have crumbled. The jury would have heard from Stites' coworkers that she was flirting with Reed. The jury would not have been told that forensic evidence proved Stites was raped and that

Reed's sperm had to have been deposited when she was murdered. And the jury would have heard damning testimony that strongly implicated Fennell. Every juror would have had reasonable doubt—and then some—about Reed's guilt.

Even though "Reed's conviction remains so mired in doubt," *Reed v. Texas*, 140 S. Ct. 686, 690 (2020) (statement of Sotomayor, J., respecting the denial of certiorari), Rodney Reed remains on death row. This Court should authorize the district court to consider his proposed second petition so the federal courts can deliver justice.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over this motion under 28 U.S.C. § 2244(b)(3), which permits "the appropriate court of appeals" to issue "an order authorizing the district court to consider a second or successive application" for a writ of habeas corpus. 28 U.S.C. § 2244(b)(3)(A), (B). Section 2244(b)(3) provides that a three-judge panel must resolve the motion, *id.* § 2244(b)(3)(B), and "shall grant or deny" it "not later than 30 days after the filing of the motion," *id.* § 2244(b)(3)(D).

## STATEMENT OF THE ISSUE

Whether the Court should authorize the district court to consider Reed's second petition for a writ of habeas corpus, because Reed has made a prima facie showing that (i) the claims in the proposed petition were not presented in a prior federal petition, (ii) the factual predicates of the claims could not have been discovered previously through the exercise of due diligence, and (iii) clear and convincing evidence shows that, but for constitutional error, no reasonable factfinder would have found Reed guilty.

## STATEMENT OF THE CASE

### A.  Reed is convicted in 1998 and has vigorously sought to prove his innocence since.

#### 1.  The state begins investigating Stites' murder.

On April 23, 1996, Stacey Stites was reported missing by coworkers after failing to report for her 3:30 a.m. shift at HEB, a grocery store in Bastrop, Texas. Stites' fiancé, Jimmy Fennell, Jr., then a police officer, told investigators that, although he was supposed to drive Stites to work that morning, the plan had changed, and Stites had left their apartment alone in Fennell's truck at around 3:00 a.m. *Ex parte Reed*, 271 S.W.3d 698, 703 (Tex. Crim. App. 2008).

Investigators located the truck that morning in a high school parking lot. *Id.* A broken segment of Stites' leather belt lay outside. *Id.* Stites' partially undressed body was discovered that afternoon several miles away. *Id.* at 704. Another piece of the belt lay nearby. *Id.* at 705. Stites' neck had a ligature pattern matching the belt. *Id.* At least one other piece of the belt was never found.

At around 11:00 p.m. that evening, crime scene investigator Karen Blakely found intact sperm on vaginal swabs of Stites. *Id.* Blakely immediately informed the lead investigator, Texas Ranger Rocky Wardlow. Blakely mistakenly believed that the longest sperm can remain intact is 24-26 hours. *See id.*; *infra* pp. 27-28. Wardlow, thus convinced that the sperm must have been deposited hours before Stites' body was found, focused his investigation on finding the man whose DNA matched the sperm. *Reed*, 271 S.W.3d at 705.

Even though Fennell was the last person to see Stites alive, and several items of potential evidence were missing from the crime scene (including part of the murder weapon), investigators never searched the couple's apartment. *Id.* at 708. And despite supposedly being the prime suspect, Fennell

wasn't polygraph tested until five months after the murder—and then he failed twice. *Id.* at 738, 742.

### 2. The state's theory at trial.

The state's case against Reed turned on DNA-matching him with the sperm collected from Stites. *Reed v. Stephens*, 739 F.3d 753, 761-62 (5th Cir. 2014). That was the only physical evidence linking him to the crime. The state's theory was that Reed and Stites were strangers, so he must have raped and murdered her.

**a.** The state's theory rested on three key forensic premises. *First*, the medical examiner testified that Stites died between 3:00 and 5:00 a.m., around when Fennell claimed she had left for work. *Id.* at 760-61; *Reed*, 271 S.W.3d at 705. *Second*, the state posited that sperm can remain intact for only 26 hours. *Reed*, 271 S.W.3d at 705. *Third*, bruising on Stites and what the state claimed were rectal injuries must have been inflicted around the time of death. *Id.* at 706. Thus, the state's theory was that (i) Stites must have been raped—suffering bruises and rectal injuries—when she was killed; (ii) the murderer deposited the sperm; and (iii) Reed and Stites were strangers, so the only way his sperm ended up in her body was by rape and murder.

In closing argument, the state emphasized Blakely's testimony about sperm's longevity. The state told the jury that "credible evidence" shows that intact sperm "doesn't hang around for days on end." SA45:6-11. Rather, the state said, "that semen got in the girl's body within 24 hours" of when investigators discovered the sperm. *Id*. According to the state, the semen was "the smoking gun"—"because it got there at the time that it did, that leads you directly to [Stites'] killer." SA48:11-17. The state also emphasized medical examiner Roberto Bayardo's testimony, which purportedly proved that Stites "was raped and sodomized" "at the time of [her] death." SA44:1-SA47:7.

**b.** The state knew that its case rested on the premise that Stites and Reed had not been in a romantic relationship. That's why it told the jury that investigators "talk[ed] to everybody, every boyfriend, every coworker, every friend, every family member, everybody" and that "[n]obody, nobody connects [Reed and Stites]." SA52:8-11. The state reiterated that nobody knew of any relationship between Reed and Stites, and it drew on racist insinuations that Stites would never have associated with Reed:

- "They talked to all these people, and not one of them during the course of the investigation that they talked to ever said she was associated with that defendant. Ever. They weren't dating

according to anyone, they weren't friends, they weren't associates." SA3:11-17.

- "[L]et's talk about the secret affair …. So [investigators] go and they talk to everybody, every boyfriend, every coworker, every friend, every family member, everybody. Nobody, nobody connects them. Nobody." SA51:24-SA52:11.

- "And we've got to look at the circumstances of Stacey's life to tell us whether [the secret affair]'s really true. … Jimmy told you that Stacey was on the green pill at the time of her death so they weren't engaging in any kind of sexual relations, but they expect you to believe that she would go out and do that with him?" SA55:5-SA56:3.

- "Now, do you really expect that [this] girl … is going to stop off on her way to work for a quickie with him? With him? Please. It's ludicrous. And frankly, in light of everything, it's offensive." SA56:24-SA57:6.

### 3. Reed files his first federal habeas petition, and this Court denies relief.

Reed first sought federal habeas relief in 2003, although federal proceedings were stayed while he exhausted additional claims in state court. *See Reed v. Thaler*, No. 1:02-cv-00142, 2012 WL 2254217, at *4 (W.D. Tex. June 15, 2012). Filed in 2009, his amended petition, SA63-SA220, asserted, among other things, claims based on his factual innocence, *Brady* claims, ineffective-assistance-of-counsel claims, and a *Napue* claim regarding false factual testimony from Fennell. *Reed*, 2012 WL 2254217, at *1-2.

The district court denied relief, *Reed v. Thaler*, No. 1:02-cv-00142 (W.D. Tex. Sept. 26, 2012), and this Court denied a certificate of appealability, *Reed*, 739 F.3d at 760. This Court reasoned that "there was no credible evidence that Reed was in a relationship with Stites." *Id.* at 772. As the magistrate judge's report and recommendation explained:

> Even if all of the other allegedly "new" evidence of innocence is credited, if this claim of a consensual sexual relationship is not one a reasonable juror would have believed, then Reed's entire claim of innocence falls apart, because other than consensual sex, the only rational explanation for how Reed's semen was in and on Stacey Stites' body is that he raped her.

*Reed*, 2012 WL 2254217, at *14.

Thus, the federal courts recognized that the state's theory—and Reed's innocence—rose or fell with whether Reed and Stites were romantically involved. As the magistrate judge put it, "Reed's claim of a consensual relationship is effectively both the beginning and the end of his assertion of innocence." *Id.* Indeed, the judge acknowledged that "persuasive evidence that Reed and Stites had consensual sex days before the murder would have clearly undermined the state's evidence" and that, "given the evidence that Fennell was racially prejudiced, evidence of an interracial affair between Stites and Reed would also have provided a credible motive for Fennell to

kill Stites." *Id.* at \*14 n.8. The magistrate judge observed, however, that "Reed was never able to identify anyone who was a friend, family member, or associate of Stacey Stites who claimed to have been aware of a relationship between Reed and Stites." *Id.* at \*43.

> **4.** **In 2019, before his then-scheduled execution, Reed seeks relief from this Court and files a new state habeas petition.**

**a.** On November 12, 2019, Reed moved this Court for an emergency stay of his execution, which was scheduled for November 20, 2019, and filed a motion to authorize the district court to consider a second federal habeas petition. *In re Reed*, No. 19-51044 (5th Cir.). The day before, Reed had also filed his tenth state habeas petition in Texas court. SA291-SA392. Because Reed's claims were pending in state court, and thus not exhausted, this Court dismissed without prejudice Reed's motion to authorize the district court to consider his second petition. SA411-SA412.

**b.** On November 15, 2019, the Texas Court of Criminal Appeals (CCA) ordered an indefinite stay of Reed's execution. SA417. It also remanded to the Texas district court for further factual development on Reed's habeas claims. *Id.* On remand, the trial court held an evidentiary hearing in July 2021.

At the hearing, 47 witnesses testified over nine days. As discussed below (at 14-29), Reed presented evidence that dismantled the state's theory. Reed called witnesses with no connection to him or motive to lie who testified that they knew Reed and Stites weren't strangers. Over a dozen credible witnesses unconnected to Reed testified that Fennell was controlling and abusive toward Stites, that Fennell knew about her relationship with Reed, and that he publicly threatened to kill her. And the state's own experts agreed with Reed's experts that forensic testimony the state had offered to convict Reed was false.

Despite this overwhelming evidence of innocence, the trial court adopted the state's proposed findings of fact and conclusions of law (FFCL) verbatim. SA605-SA654. The court thus found Fennell and all the state's witnesses (including several of Fennell's family members) credible, but none of Reed's witnesses credible, even though none was affiliated with Reed. SA622-SA646. The court made no pretense of conducting a careful, independent review. The state's findings that the court rubberstamped were riddled with errors. The CCA later observed that the trial "court's recommended FFCLs in this case contain multiple oversights which come directly

from the State's proposed FFCLs." *Ex parte Reed*, 670 S.W.3d 689, 744 (Tex. Crim. App. 2023).

After the hearing, and based on the state's constitutional violations that Reed discovered in preparation for and during that hearing (as discussed below at 14-29), Reed filed his eleventh state habeas petition. SA656-SA721. That petition alleged that the state violated *Brady* by withholding exculpatory evidence, SA696-SA697, SA699-SA706, and violated *Napue* by soliciting false trial testimony, SA697-SA699, SA706-SA717.

On June 28, 2023, the CCA denied Reed habeas relief on his tenth and eleventh petitions. *See Reed*, 670 S.W.3d 689 (decision on tenth petition); *Ex parte Reed*, No. WR-50,961-11, 2023 WL 4234348 (Tex. Crim. App. June 28, 2023) (decision on eleventh petition). On October 4, 2023, the CCA dismissed Reed's motion for reconsideration. SA728.

**B.     Newly discovered evidence of Reed's innocence—and of the state's additional constitutional violations—comes to light before and during the 2021 evidentiary hearing.**

Between September 2019 and the July 2021 evidentiary hearing, Reed gathered additional evidence of his innocence, uncovering at least four constitutional violations the state had committed in connection with his trial. *First*, the state failed to disclose that three of Stites' coworkers had told

investigators that Reed and Stites were potentially acquainted. *Second*, the state solicited false testimony regarding the investigation into the connection between Reed and Stites. *Third*, the state failed to disclose information known to police and prosecutors that implicated Fennell in the murder. *Fourth*, the state solicited false testimony regarding the longevity of sperm and whether Stites was sexually assaulted.

### 1. The state failed to disclose that witnesses had told investigators that Reed and Stites were connected.

The state emphasized that investigators had "talk[ed] to everybody, every boyfriend, every coworker, every friend, every family member" and that "nobody connect[ed]" Stites and Reed. SA52:8-SA52:14. That was false, prosecutors knew it, and they withheld critical exculpatory information from Reed that did, in fact, connect him with Stites.

As Reed discovered while preparing for the 2021 evidentiary hearing, the state knew before trial of at least three witnesses—Suzan Hugen, Andrew Cardenas, and Ron Hass—who knew or had heard that Reed and Stites were acquainted. What's more, other witnesses who testified at the hearing corroborated that Reed and Stites did know each other and were romantically involved before the murder.

**a.** In two letters dated June 25, 2021, the state disclosed that investigators knew before the trial of at least three HEB employees who knew or had heard rumors about a relationship between Reed and Stites.

**i.** In one letter, the state told Reed's lawyers that it had "discovered" "witness interview summaries" "created by the trial prosecution team in preparation for the underlying 1998" trial. SA419. That letter enclosed summaries of interviews with Haas and Cardenas, HEB employees. It disclosed that Haas "had heard rumors at HEB that [Reed] knew Stacey Stites." *Id.* It also disclosed that another HEB employee had told Cardenas that "he saw [Reed] speaking with Stacey Stites at HEB" and that Cardenas "got the impression" from that conversation "that [Reed] and Stacey Stites knew each other." *Id.*

**ii.** The second letter concerned Suzan Hugen. According to the letter, Hugen was "a former HEB employee" who had seen "[Reed] and Stacey Stites at the store" about a week before the murder. SA426. "Hugen said that [Stites] introduced [Reed] to her as a good or close friend and that they appeared friendly, giggling, and flirting." *Id.* The state's letter also disclosed that Hugen had shared this information with "possibly Paul Alexander," a Bastrop police officer. *Id.*

Hugen's testimony at the 2021 hearing confirmed that she had firsthand knowledge of a relationship between Reed and Stites and that she had told investigators that before trial. Hugen testified that she and Stites were friends and coworkers at HEB. SA479:8-SA480:22, SA490:3.

Hugen confirmed that she had known that Reed and Stites were close. Shortly before Stites' death, Hugen saw Stites standing close to a Black man in the produce section at HEB. SA484:2-14. Stites asked Hugen to come over and introduced Hugen to her "very good friend, Rodney." SA484:14-19, SA490:3-5. According to Hugen, Stites had "her hand … in the middle of [Reed's] back," and the two were "flirty," "smiling," and "having a good time." SA484:16-22, SA490:3-19. "It seemed like more than a friendship." SA484:23.

Hugen shared this information with investigators. She came forward after she had seen media reports saying that Reed was a suspect and that he and Stites had not known each other. SA486:7-19. Hugen turned to a Bastrop police officer—Paul Alexander, in fact—who had been providing security for HEB. SA485:18-SA487:2. Hugen told Alexander that Stites and Reed were not strangers and that Stites had told Hugen that Reed was a friend. SA486:12-19.

**b.** Many other witnesses who testified at the 2021 hearing corroborated Hugen's late-breaking but critical exculpatory information that Reed and Stites had a relationship before the murder. Some of those witnesses specifically testified that the two were romantically involved. For example:

- Alicia Slater, Stites' HEB coworker, testified about a conversation she and Stites had about Stites' engagement ring. SA521:23-25, SA523:1-18. Slater had asked if Stites was excited to get married. SA523:18-19. Stites responded that she wasn't, and in fact, that she was "sleeping with a black man named Rodney." SA523:19-22. Stites said that she didn't know what her fiancé would do if he found out and that she had to be careful. SA524:14-16.

- Brenda Dickinson was Stites' friend and another HEB coworker. She testified about having seen Stites speaking with a Black man at HEB. Dickinson asked, "Who's that secret admirer of yours?" Stites was "giddy" and responded, "[h]e's just a friend" and "his name was Rodney." SA544:23-SA545:11.

- Rebecca Randall, another coworker, testified that she had seen Stites and Reed together at HEB. SA463:20-22. Randall specifically recalled seeing the two "standing there in very close proximity, standing very close together, having a very quiet conversation." SA464:17-22. Randall said that she recognized Reed and had seen him speaking with Stites previously. SA464:23-25. Randall also recalled seeing Stites playing basketball with someone she believed to be Reed. SA465:6-9.

- Calvin Horton, Stites' cousin, testified that Stites had a history of dating Black men. SA538:9-18. He said that, in the fall of 1995, he saw Stites at the Bastrop Dairy Queen with a Black man he believes was Reed. SA532:18-22, SA534:22-SA535:13.

- Victor Juarez, another of Stites' HEB coworkers, testified that he knew Reed from a youth-outreach basketball program and from when Reed would come into HEB. Juarez testified that he had seen Stites and Reed together in a car in a parking lot. SA459:24-SA460:16.

### 2. Reed discovers that the state used false factual testimony at his trial.

Based on the state's June 25, 2021, disclosure letters and testimony given at that hearing, Reed also learned that the state had solicited at least two key pieces of false testimony to convict him.

*First*, the state offered false testimony from Bastrop Police Department patrol officer and criminal investigator Paul Alexander. Alexander testified that he had no "responsibilities or activities in the investigation" after calling to report a truck parked at the Bastrop High School on the morning Stites was reported missing. SA7:2-4, SA11:4-8. That was a lie. In fact, Alexander had reported potential suspects to the lead investigator, Rocky Wardlow, and even wrote a memorandum about one of those suspects. SA724. What's more, as discussed, when Alexander was a patrol officer at HEB, Hugen had told him that Stites and Reed had been friends. *Supra* p. 17. Thus, Alexander's testimony that he was not involved in the investigation—and the misleading implication that he had nothing further to report—was false.

*Second*, the state solicited false testimony from Wardlow about whether the investigation had uncovered "anybody that said [Stites] had been associating with [Reed]." SA34:24-SA35:11. Wardlow, the lead investigator, agreed that investigators did not "find anyone who linked [Stites] in any way to this defendant." *Id.* As the state's June 25, 2021, disclosure letters showed, that was false, and prosecutors knew it. Indeed, the state now admits that the "trial prosecution team" had "witness interview summaries" indicating that some HEB employees believed that Reed and Stites were acquainted. SA419.

### 3. The state failed to disclose that witnesses had information implicating Fennell.

Reed and his team also discovered before the evidentiary hearing that, at the time of his trial, prosecutors and police knew about other evidence that inculpated Fennell—and, by extension, exculpated Reed—but failed to disclose it. And those pieces of evidence are by no means the only things pointing to Fennell's guilt. Through his continued efforts to prove his innocence, Reed has amassed significant evidence implicating Fennell.

**a.** The state failed to disclose before trial that witnesses knew that Stites and Fennell's relationship was broken—even violent. One witness had

conveyed that information to a district attorney. Two other witnesses were *themselves* police officers. Yet Reed first learned of these witnesses, through his own extraordinary diligence, in September and October 2019, shortly before his then-scheduled execution date.

*i.* William Sappington, who lived in the apartment directly below Fennell and Stites, told both a police officer and a district attorney that he would often hear aggressive fighting coming from the couple's apartment. That information was never disclosed to Reed.

Although William Sappington had since passed away, in September 2019, Reed's postconviction team confirmed that he lived below Fennell and Stites and tracked down a relative. William's son and daughter-in-law, Brent and Vicki Sappington, then testified at the 2021 hearing. Brent testified that, while visiting his father, he heard a "commotion" coming from Fennell's apartment that "sounded like a bunch of tables and chairs being turned over with a bunch of screaming and hollering." SA501:14-19. William told him: "That's Jimmy up there talking—yelling at Stacey. It goes on all the time." SA501:22-23. Brent testified that he was "really concerned" for Stites' safety. SA502:21-23. Vicki confirmed in her testimony that, around the time of the murder, her father-in-law talked about "the times he heard all the noise

above, Jimmy screaming at Stacey," and that "it was very abusive language," with Fennell sounding "very aggressive." SA509:6-10.

Brent also testified that his father had reported his concerns about Fennell to a Giddings, Texas, police officer and to the Lee County district attorney, Ted Weems. SA504:9-SA505:1. Those officials told William Sappington that "they already had their suspect" and that they "didn't need nobody's help." SA505:6-9. Weems confirmed at the 2021 hearing that William Sappington had told him that "he wanted me to know that he had heard arguing there before, loud arguing many times." SA593:12-SA594:4. Weems also testified that he believes the Sappingtons are honest and a "fine family." SA600:4-7. But neither Weems nor any other state official provided this information to Reed. Reed's postconviction team learned about it through their own diligence.

*ii.* Two police officers who testified at the 2021 hearing—Charles Wayne Fletcher and Jim Clampit—also had personal knowledge before the trial that implicated Fennell, but that information was never disclosed to Reed. Even though Fletcher was an officer in Bastrop County (where the murder occurred) and Clampit was an officer in Lee County (where Stites and Fennell lived), Reed learned of their exculpatory knowledge only in

September and October 2019—through his continued diligence and because Clampit came forward on his own.

Fletcher—who was friends with Fennell and Stites and a member of the Bastrop County Sheriff's Office—knew that Fennell and Stites' relationship was falling apart and that Fennell had a motive to murder Stites. Fletcher witnessed the couple fighting at a social gathering, after which Fennell told Fletcher that Stites was "fucking a n****r." SA440:10-25. Fletcher also recalled that Fennell behaved oddly during Stites' funeral and that he "looked cold, empty, and emotionless." SA399 ¶ 7. Fletcher "was so disturbed" by Fennell's behavior that he began to "question whether [Fennell] was involved in [Stites'] death." SA399 ¶ 8.

Clampit—an officer in the Lee County Sheriff's Department—also observed inculpatory behavior from Fennell at Stites' funeral. Clampit witnessed Fennell say to Stites' body that "she got what she deserved." SA449:3-16. Clampit said that he "has often thought about what [Fennell] said at [Stites'] service[]" and that he came forward in September 2019 because he "knew that [he] would not be able to live with [himself] if [he] did not." SA403 ¶ 8.

**b.** A growing mountain of other evidence Reed has uncovered since trial also implicates Fennell in Stites' murder.

**i.** Other witnesses at the hearing corroborated the Sappingtons', Fletcher's, and Clampit's accounts about Fennell and Stites' relationship. Over a dozen credible witnesses (none of whom had any relationship with Reed) testified that the couple's relationship was broken and that Fennell controlled and abused Stites. For example:

- Rubie Volek, a life-insurance agent through whom Stites had applied for a policy, testified that Fennell told Stites, "[i]f I ever catch you messing around on me, I will kill you and nobody'll know that I was the one that did it." SA444:22-SA445:12.

- Brenda Dickinson (Stites' coworker and friend, *supra* p. 18) testified that Stites was afraid of her fiancé and, because of his jealous and controlling behavior, had expressed doubts about getting married. SA542:20-SA543:5, SA544:1-12. Dickinson recalled that Fennell sometimes caused a scene and yelled at Stites when he visited HEB. SA544:13-22.

- Paul Espinoza, Stites' high school classmate and HEB coworker, testified that he once saw Fennell approach Stites in an "aggressive manner" at HEB and "scold[]" her. SA467:7-SA468:17, SA471:7-19. Espinoza found Stites crying afterward when he went to check on her. SA475:21-25. He said this interaction stood out because it was the last time he spoke with Stites before she died. SA476:14-25.

- Suzan Hugen (Stites' friend and co-worker, *supra* p. 17) testified that, days before the murder, Stites had asked her to go wedding shopping. Stites abruptly canceled, telling Hugen "she wasn't

shopping for that wedding." SA481:21-SA482:8. Hugen believed that Stites' relationship with her fiancé was abusive. SA483:1-21. Hugen testified that she had been in an abusive relationship and learned to wear long sleeves to cover bruises. SA483:6-8. Hugen once noticed telltale "fingerprint" bruises on Stites' lower arms. SA483:22-SA484:1.

• Former police dispatcher Cindy Schmidt testified that she heard Fennell say "at least the bitch got to wear the damn dress" at Stites' funeral. SA513:16-SA514:1. Schmidt also testified that Fennell had told a fellow officer: "If I ever catch [Stites] fucking a n****r, I'll kill her." SA517:6-18.

*ii.* What's more, while Fennell was serving a prison sentence for raping a woman while he was an on-duty police officer, he twice *confessed* to murdering Stites. Fellow inmate Arthur Snow said in a sworn affidavit that Fennell told him that Stites "had been sleeping around with a black man behind his back." SA395 ¶ 7. Fennell told Snow, "I had to kill my n****r-loving fiancé[e]." *Id.* Another inmate, Michael Bordelon, testified at the hearing that Fennell told him that his fiancée was "screwing a N-word." SA454:15-17. But, Fennell told Bordelon, he "took care of the problem" and "got rid of her." SA453:17-SA454:6, SA456:1-7.

*iii.* Significant inconsistencies have also emerged in Fennell's account of the night that Stites disappeared. At trial, Fennell testified that, he was at home with Stites the evening before the murder. SA27:16-24. He said

- 25 -

that Stites went to bed and he stayed up watching TV before going to sleep. SA30:6-25. But after the trial, Curtis Davis—a police officer and a close friend of Fennell's—gave a significantly different account. According to Davis, on the day Stites' body was discovered, Fennell had initially recounted that he had stayed out drinking with fellow officers the night before. SA251-SA252. When confronted with Davis's account at a 2017 hearing, Fennell asserted the Fifth Amendment and refused to testify. SA287:4-SA288:19. At the 2021 hearing—by which point, Davis had died—Fennell changed gears and claimed Davis was lying. SA549:1-8.

Those inconsistencies in Fennell's testimony are all the more inculpatory in light of certain forensic testimony presented at the 2021 hearing. Evidence showed that Stites likely died hours before the narrow 3:00-to-5:00-a.m. window the state provided at trial—a window based on Fennell's own account of when Stites left home. The evidence shows that Stites likely died when Fennell claims he and Stites were alone together. SA429:5-11, SA432:6-15, SA494:17-SA495:8. In fact, the state's time-of-death window is at odds with postmortem changes to Stites' body. SA435:17-SA436:14, SA497:7-22. The state's experts at the evidentiary hearing couldn't support the state's narrow window, either, SA553:1-8, SA571:3-22, SA585:19-SA586:10, further

undermining the state's theory that Stites was murdered after Fennell claims she left home.

> ### 4. Reed discovers the state's use of false forensic testimony at his trial.

At the 2021 hearing, the state's experts *admitted* that forensic testimony at trial was false—including testimony that sperm cannot survive intact for more than 26 hours and that Stites must have been raped at the time of her death. That trial testimony was critical to supporting the state's narrative that Stites and Reed were strangers and Reed murdered Stites. Thus, the state's experts agree that Reed has now proven false key forensic premises the state relied on to convict him.

**a.** At trial, the state solicited testimony from Karen Blakely, who cited "published documentation that says 26 hours is about the outside length of time" that sperm will remain intact. SA22:13-16. The state relied on that testimony to argue, as it emphasized at closing arguments, that sperm found in Stites' body, with DNA that matched Reed's, must have been deposited around the time she was murdered. SA44:25-SA45:12.

At the 2021 hearing, however, the state's own experts agreed that sperm can survive intact for days, and that the jury was given false testimony

when Blakely told jurors that the sperm must have been deposited the night Stites died. One expert for the state, Dr. Norma Jean Farley, a deputy chief medical examiner in Bexar County, agreed that studies show that sperm can survive for much longer than 24 hours, sometimes for days, even in deceased victims. SA574:8-20. Dr. Farley testified that Blakely had misrepresented a scientific study, which Blakely said supported her view that sperm can survive for only 24 hours. SA575:18-21. Another of the state's experts, Dr. Suzanna Dana, a former medical examiner, also testified that it was false to say that sperm cannot survive for more than 24 hours, and she agreed that Blakely had misrepresented that study. SA558:24-SA559:9.

**b.** The state argued at trial that Reed raped Stites as he murdered her. SA45:6-12, SA47:22-25. In support, it relied on testimony from medical examiner Roberto Bayardo that Stites' "anus was dilated" and had "lacerations" "consistent with penile penetration." SA39:6-15. Bayardo testified that "this injury occurred at the time of her death" and that the anal penetration "would not have been consensual." SA39:6-SA40:13. Blakely also testified at trial about bruises on Stites' body and said that, based on their color, they also must have been inflicted shortly before Stites died. SA14:24-SA17:20.

But the state's experts at the 2021 hearing said that all that testimony was false, too. Dr. Farley agreed with Reed's experts that anal dilation is a normal postmortem occurrence and does not indicate sexual activity or assault. SA578:18-SA579:6. Dr. Dana and Dr. Farley also agreed that there was no scientific basis for Bayardo to have testified that Stites was sexually assaulted based on her purported rectal injuries. *Id.*, SA566:17-SA567:3. The state's experts also rejected Blakely's testimony about dating the bruises on Stites' body. Dr. Farley said that bruises cannot be dated with any accuracy. SA582:2-11. Dr. Dana agreed that Blakely was wrong to testify that certain bruise colors have any bearing on bruise age. SA562:1-SA563:1.

### C. Reed now asks this Court to authorize the district court to consider his second federal habeas petition.

#### 1. Reed's proposed second petition asserts *Brady* and *Napue* claims.

Given these newly discovered constitutional violations, Reed now respectfully asks this Court to authorize the district court to consider a second petition for a writ of habeas corpus. As the proposed petition filed with this motion reflects, Reed's second petition asserts *Brady* and *Napue* claims and alleges that the state violated Reed's constitutional due-process rights by failing to disclose material, exculpatory evidence before trial and by

soliciting false factual and forensic testimony at trial. Specifically, the petition alleges that:

- The state violated *Brady* by failing to disclose to Reed that prosecutors or police officers knew that witnesses (Suzan Hugen, Andrew Cardenas, and Ron Hass) had information about a connection between Stites and Reed.

- The state violated *Napue* by soliciting false factual testimony at trial from Paul Alexander and Rocky Wardlow about the investigation into the connection between Reed and Stites.

- The state violated *Brady* by failing to disclose to Reed that prosecutors or police officers knew that witnesses (William Sappington, Charles Wayne Fletcher, and Jim Clampit) knew about Stites and Fennell's strained—even abusive—relationship and inculpatory remarks Fennell made.

- The state violated *Napue* by soliciting false forensic testimony from witnesses at trial about how long sperm can survive intact and about if and when Stites was sexually assaulted.

### 2. Reed exhausted his claims in state court.

Reed exhausted these claims in state court. He asserted most of these claims in his eleventh state habeas petition. There, Reed brought *Brady* claims based on the state's failure to disclose exculpatory information from Hugen, Cardenas, Hass, and Sappington. SA678-SA684, SA699-SA706. Reed also brought claims regarding Alexander's and Wardlow's false trial testimony, SA706-SA709, and regarding the false forensic trial testimony, SA709-SA717. The CCA denied relief. *Reed*, 2023 WL 4234348, at *4-8.

Reed brought the remaining claims in his tenth state habeas petition, where he asserted a *Brady* violation arising from the state's failure to disclose exculpatory information from Fletcher and Clampit. SA375-SA378. The CCA denied relief. *Reed*, 670 S.W.3d at 764-67.

## SUMMARY OF ARGUMENT

The Court must authorize the district court to consider Reed's proposed second habeas petition if he makes a prima facie showing that: (A) he did not present his claims in a prior federal petition, 28 U.S.C. § 2244(b)(1); (B) the claims' factual predicates "could not have been discovered previously through the exercise of due diligence," *id.* § 2244(b)(2)(B)(i); and (C) if he proves the facts underlying his claims, there will be "clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found [him] guilty," *id.* § 2244(b)(2)(B)(ii). Reed satisfies each element, so the Court "must grant" his motion. *Cathey*, 857 F.3d at 226-27.

**A.**    Reed did not present these claims in his prior federal petition. Reed's proposed petition asserts *Brady* and *Napue* violations, and although his previous federal petition also brought *Brady* and *Napue* claims, those earlier claims arose from different factual predicates and asserted distinct constitutional violations. Indeed, Reed's prior federal petition couldn't have

asserted the claims he brings here because he didn't discover the factual predicates underlying any of these claims until seven years after the district court disposed of his first petition.

**B.** Reed could not have discovered the factual predicates for his claims earlier through due diligence, and the claims are timely.

**1.** Reed discovered the factual predicates for his *Brady* claims at or right before the 2021 hearing (as to the claims concerning Hugen, Cardenas, and Haas), and at the earliest in September or October 2019 (as to the claims concerning William Sappington, Fletcher, and Clampit). He could not have discovered the factual predicates for those claims sooner because he was entitled to rely on the state's (false) representations that it had "talk[ed] to … every coworker" of Stites', SASA52:8-10, "canvassed [Fennell's] apartment" building, SA60:11-16, and failed to uncover any witnesses with material information.

**2.** Reed discovered the factual predicates for his *Napue* claims at or right before the 2021 hearing. Reed could not have discovered the basis for those claims sooner, because he could not have shown that the state *knowingly* solicited false testimony until the state disclosed as much in its June 25,

2021 letters, or admitted at the hearing that it had offered false forensic testimony.

3.      Reed's claims are timely. The one-year statute of limitations runs from when the factual predicate of a claim "could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). That period is tolled while a prisoner seeks postconviction review in state court, 28 U.S.C. § 2244(d)(2)—here, between November 11, 2019 (when Reed filed his tenth state habeas petition) and October 4, 2023 (when the CCA dismissed his motion for reconsideration). *See Emerson v. Johnson*, 243 F.3d 931, 935 (5th Cir. 2001). Thus, Reed's claims are timely so long as he could not have discovered their factual predicates until on or after August 6, 2019. Reed could not have discovered the predicates for any of his claims before September 2019.

C.      The facts underlying Reed's claims establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.

1.      Because of the state's *Brady* violations, the jury never heard exculpatory evidence from Stites' coworkers that she and Reed had been acquainted and flirted before the murder. Instead, because of the state's *Napue* violations, the jury heard false testimony from investigators that nobody

could corroborate Reed's defense. Without those errors, the state could not have convinced the jury of one of its key premises: that Reed and Stites were strangers.

2. Because of the state's additional *Brady* violations, the jury also never heard testimony that Fennell acted violently toward Stites, knew about her affair with Reed, and had made inculpatory remarks after her death. Any reasonable juror who had heard that testimony would have had reasonable doubt about Reed's guilt.

3. Because of the state's solicitation of false forensic testimony, in violation of *Napue*, the jury was erroneously told that Stites was sexually assaulted and that Reed's sperm was deposited around the time of her death. The state's experts now agree that testimony was false. Without that testimony, the prosecution would have lost its "smoking gun." SA48:11-17. The only thing the forensic testimony would have shown was that Reed and Stites had had sex sometime in the days before her death. Given Reed's defense of a consensual relationship, the jury would have had reasonable doubt.

4. But for any one of these constitutional violations, no reasonable juror would have convicted Reed. But for all of the violations, the state

would have had no case left. The state could not have convinced the jury that Reed and Stites were strangers or that Reed sexually assaulted Stites (much less at the time she died). Nor could it have avoided the significant evidence that *Fennell* killed Stites.

**D.**     This Court does not decide the merits of the underlying constitutional claims, but Reed will be able to prove his *Brady* and *Napue* claims in the district court. The state suppressed material exculpatory evidence, and it knowingly solicited material false testimony. The CCA's resolution of Reed's claims isn't entitled to deference under 28 U.S.C. § 2254(d). The CCA didn't resolve several of the claims on the merits, meaning § 2254(d) doesn't apply by its terms. And for the others, the CCA's rulings rested on an "unreasonable determination of the facts," *id.* § 2254(d)(2), and contradiction or unreasonable application of Supreme Court precedent. The district court thus will review Reed's claims de novo.

## LEGAL STANDARD

Reed must obtain this Court's authorization for the district court to consider a second habeas petition under § 2254. *Id.* § 2244(b)(3). Reed is entitled to authorization if he makes "a prima facie showing," *id.* § 2244(b)(3)(C), that (1) his claim "was not presented in a prior application,"

*id.* § 2244(b)(2); (2) "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence"; and (3) "the facts underlying the claim, if proven, and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense," *id.* § 2244(b)(2)(B). *In re Will*, 970 F.3d 536, 541 (5th Cir. 2020). This Court's caselaw explains how to assess these requirements.

  **1.** Start with "a prima facie showing." 28 U.S.C. § 2244(b)(3)(C). "A prima facie showing is 'simply a sufficient showing of possible merit to warrant a fuller exploration by the district court.'" *Will*, 970 F.3d at 541. At "this stage, this court does not rule on the ultimate merits." *Id.* Indeed, the Court does not even definitively rule on whether the prisoner's claims satisfy § 2244(b)'s requirements. Rather, if the motion is granted, "the district court" will "independently determine whether the petition *actually satisfies*" these "requirements." *In re Swearingen*, 556 F.3d 344, 347 (5th Cir. 2009); *see* 28 U.S.C. § 2244(b)(4). This Court "simply determines if this 'second or successive' habeas application deserves fuller review by the district court," *Will*, 970 F.3d at 541. If "it appears 'reasonably likely'" from "the motion and

supporting documents" that the petition meets § 2244(b)(2)(B)'s requirements, the Court "must grant" the district court authorization to consider the petition. *Cathey*, 857 F.3d at 226-27.

2.    Next, take the due diligence requirement in § 2244(b)(2)(B)(i). "Section 2244(b)(2)(B)'s due-diligence requirement 'is measured objectively, not by the subjective diligence of the petitioner.'" *Will*, 970 F.3d at 541-42. Thus, the Court does not ask whether Reed specifically "exercised due diligence," but rather whether the facts he asserts in his petition "objectively *could not have been* discovered through the exercise of due diligence." *Id.* at 542. A prisoner asserting a *Brady* violation satisfies this standard by showing that "the trial record contains no evidence which would have put a reasonable attorney on notice" of the withheld evidence. *Id.* at 541.

3.    The third requirement, that "no reasonable factfinder would have found [Reed] guilty" given "the facts underlying the claim" but for constitutional error, requires the Court to assume that those facts are "proven." 28 U.S.C. § 2244(b)(2)(B)(ii). The Court also "need not determine that [Reed] is factually innocent." *Will*, 970 F.3d at 544. Instead, the Court "assume[s] the merits of [Reed's] asserted constitutional error at this stage," *Swearingen*, 556 F.3d at 348, and "only consider[s] whether there is possible

merit" to his claim that "no reasonable juror would have found [Reed] guilty," *Will*, 970 F.3d at 544. The Court asks whether "it is *reasonably likely* that, after hearing the new evidence alongside the old evidence, every reasonable juror would have some level of reasonable doubt." *Id.* at 547.

**4.** Putting these requirements together, the Court "must grant" Reed's motion, *Cathey*, 857 F.3d at 226-27, if it finds "possible merit" to his arguments that (1) he has not asserted his claims in a prior habeas petition; (2) he "objectively could not have … discovered" the facts underlying his claims sooner through reasonable diligence, *Will*, 970 F.3d at 541-42 (emphasis omitted); and (3) "it is reasonably likely that, after hearing [his] new evidence," the jury "would have some level of reasonable doubt," *id.* at 547.

## ARGUMENT

The Court should grant Reed's motion and authorize the district court to consider his second petition for a writ of habeas corpus, because Reed has made a prima facie showing that (A) he did not present any of these claims in a prior federal habeas petition, 28 U.S.C. § 2244(b)(1); (B) the factual predicates of these claims "could not have been discovered previously through the exercise of due diligence," *id.* § 2244(b)(2)(B)(i); and (C) if the facts underlying his claim are proven, there will be "clear and convincing evidence

that, but for constitutional error, no reasonable factfinder would have found [him] guilty" of Stites' murder, *id.* § 2244(b)(2)(B)(ii).

**A.** **Reed did not present the claims in his proposed second habeas petition in his prior federal habeas petition, so they are not barred by 28 U.S.C. § 2244(b)(1).**

In this proposed second petition, Reed seeks relief based on the state's *Brady* and *Napue* violations. *Supra* pp. 29-30. None of these claims is barred by 28 U.S.C. § 2244(b)(1) because Reed did not bring (and could not have brought) these claims in his prior federal habeas petition. Although Reed's prior federal petition alleged *Brady* claims and a *Napue* claim, *see Reed*, 2012 WL 2254217, at *1-2, those were different claims asserting distinct constitutional violations arising from different factual predicates.

**1.** Reed's prior *Brady* claims alleged that the state failed to provide exculpatory evidence concerning: (i) "[t]he result of DNA tests"; (ii) a statement from Mary Blackwell that "she overheard Fennell state that he would choke Stites with a belt if he ever caught her cheating on him"; (iii) a statement from Martha Barnett that "she saw Stites with … Fennell in the early morning hours on the day of her murder"; (iv) statements from Brenda, Jennifer, and Paul Prater that "they saw Stites early in the morning hours on the day that she was murdered with persons other than Reed"; (v) "Pam

Duncan's statement that Fennell was controlling and abusive during their dating relationship"; (vi) inculpatory comments about Fennell made by officer David Hall during the Stites' murder investigation; and (vii) evidence that Fennell (and other law-enforcement officers) engaged in misconduct on other cases. *Id.*

Reed isn't asserting any of those claims in his proposed second petition. As explained, the *Brady* violations alleged in this petition pertain to different exculpatory evidence that was improperly withheld. *Supra* pp. 15-17, 20-23, 30.

**2.** Reed's prior petition also did not bring the *Napue* claims he asserts in his proposed second petition. His first petition alleged that "the State knowingly presented false testimony from Fennell." *Reed*, 2012 WL 2254217, at *17. Here, in contrast, Reed's false-factual-testimony *Napue* claims allege that investigators testified falsely at trial about the state's investigation into the relationship between Reed and Stites. *Supra* pp. 19-20.

Nor did Reed's prior petition bring a *Napue* claim about false forensic testimony. The prior petition alleged that Reed's trial counsel was ineffective for failing to "[e]ffectively impeach the State's forensic evidence." *Reed*, 2012 WL 2254217, at *2. But here, Reed argues that the prosecution and

investigators knew or should have known that forensic testimony it was soliciting at trial was *false*—based on admissions made by the state's experts at the 2021 hearing. *Supra* pp. 27-29. That's a different claim.

**3.**     Indeed, as discussed below (at 41-45), Reed's prior federal habeas petition could not have brought the claims he brings here. Reed did not discover the factual predicates underlying any of these claims until September 2019 at the earliest. Reed thus could not have asserted these claims in his first petition, which the district court denied in 2012. *Supra* pp. 10-11.

**B.     Reed could not have discovered the factual predicates for these claims earlier through the exercise of due diligence, and the claims are timely.**

Reed could not have discovered the factual predicates underlying his claims any sooner by exercising objectively reasonable diligence. At minimum, he has shown that there is "possible merit" to that argument. *Will*, 970 F.3d at 541. And his claims are timely under 28 U.S.C. § 2244(d).

**1.     Reed could not have discovered the factual predicates for his *Brady* claims any earlier.**

Reed was diligent in discovering the factual basis for his *Brady* claims. "Trial counsel need not assume the prosecution may be withholding information in order to exercise diligence." *Will*, 970 F.3d at 542. That's especially

true "when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. 668, 695 (2004). Indeed, "counsel may rely, absent notice to the contrary, on representations by the prosecutor." *Will*, 970 F.3d at 543. Here, "the trial record contains no evidence which would have put a reasonable attorney on notice" that the withheld exculpatory evidence existed. *Id.* at 541. In fact, the prosecutors at the trial affirmatively represented that this exculpatory evidence did *not* exist.

a.     Reed could not have discovered before June 25, 2021 the factual predicates for his claims regarding the state's withholding of exculpatory information reported by three of Stites' coworkers—Hugen, Cardenas, and Haas—about a connection between Reed and Stites. That was when the state sent letters disclosing that evidence. *Supra* p. 16. Reed couldn't have discovered that information earlier, especially considering the state's misrepresentation at trial that investigators "talk[ed] to every boyfriend, every coworker, every friend, every family member" of Stites', but that "[n]obody, nobody connects [Reed and Stites]." SA52:8-11. That misrepresentation—that the prosecution talked to "every coworker" but "nobody connect[ed]" Reed and Stites—makes clear that Reed's inability to identify Hugen, Cardenas, and Haas sooner wasn't due to his lack of diligence.

**b.**     Nor could Reed have discovered any earlier that the state failed to disclose information from Sappington, Fletcher, and Clampit that inculpated Fennell. Reed first learned that these witnesses existed and could have relevant knowledge in September and October 2019—just before his then-scheduled execution date—through his team's extraordinary persistence. In the ensuing months, Reed learned that Sappington often heard Fennell fighting violently with Stites, and that Fletcher and Clampit were police officers who heard Fennell make racist, inculpatory remarks both before and after Stites' murder. *Supra* pp. 20-23.

Here, too, the state's misrepresentations and failures made it difficult if not impossible for Reed to discover these claims any earlier. The state said that Fennell's testimony was unimpeachable and specifically represented that investigators "canvassed his apartment," and "looked everywhere, and nobody could find anything inconsistent." SA60:11-16. Reed had no duty to redo the investigators' work and speak to each of Fennell's neighbors given the state's representation that investigators had already "canvassed his apartment"—indeed, such a requirement would nullify *Brady*. Nor could Reed be expected to know that police officers—who have a duty to come forward with relevant information about an investigation—would stay

silent for decades, especially when nothing at trial indicated that Fletcher or Clampit had relevant information. *See Will,* 970 F.3d at 541-42.

### 2. Reed could not have discovered the factual predicates for his *Napue* claims any sooner.

Reed discovered the key factual predicates for his *Napue* claims at or right before the 2021 hearing, through the state's disclosures or testimony at that hearing. Reed couldn't have discovered the information sooner, because the state didn't disclose it earlier.

**a.** Reed could not have discovered the basis for his false factual testimony claims until the state disclosed crucial exculpatory information in its June 25, 2021, letters. *Supra* p. 16. From one letter, Reed learned that, despite the state's contrary prior representations, prosecutors had "witness interview summaries" with information connecting Reed and Stites. SA419. That was the first moment Reed could have discovered that the lead investigator's testimony—that the state's investigation had not turned up any such evidence—was false. *Supra* p. 20.

The other letter revealed that a witness had told "possibly Paul Alexander" that Reed and Stites had been "flirting." SA426. Further factual development then confirmed that that witness had shared that information

with Paul Alexander. *Supra* p. 17. That was the first moment Reed could have discovered that Alexander's trial testimony—that he wasn't involved in the case other than reporting seeing Fennell's truck at the high school—was false. SA7:2-4, SA11:4-8.

**b.** Reed likewise couldn't have discovered the key factual predicate for his false forensic testimony claim until the state's own forensic experts agreed at the 2021 hearing that the state had offered false testimony. The state's experts, Dr. Farley and Dr. Dana, testified that the state had misrepresented a study that the state claimed stood for the false proposition that sperm can survive intact for only 26 hours—in fact, sperm can survive for days. *Supra* pp. 27-28. Dr. Farley and Dr. Dana also agreed that the state offered false trial testimony that Stites was anally penetrated and sexually assaulted as she died. *Supra* pp. 28-29.

A key component of Reed's *Napue* claims is that the state knew or should have known the information was false or misleading. *See infra* pp. 58-60. Although Reed has long maintained that the forensic evidence the state offered at trial was flawed, until the 2021 hearing, he couldn't bring a false testimony claim based on representatives of the state now *agreeing* that the state solicited false forensic testimony.

### 3.     Reed's claims are timely.

All of Reed's claims are timely. The one-year statute of limitations runs from "the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2244(d)(1)(D). But "[t]his limitations period is tolled while a state prisoner seeks postconviction relief in state court," *Lawrence v. Florida*, 549 U.S. 327, 331 (2007); *see* 28 U.S.C. § 2244(d)(2), meaning, here, until the CCA "resolve[d] the motion or suggestion for reconsideration," *Emerson*, 243 F.3d at 935. The CCA dismissed Reed's motion for reconsideration on October 4, 2023, so the limitations period began to run on that date.

Today, June 28, 2024—268 days after October 24, 2023—Reed is filing this authorization motion, just "[b]efore" his proposed second petition "is filed in the district court" later today. 28 U.S.C. § 244(b)(3)(A). Thus, 97 days remain on the clock and extend back from November 11, 2019—when Reed filed his tenth state habeas petition—to August 6, 2019.

Reed's claims are timely because he could not have discovered their factual predicates before August 6, 2019. As discussed (at 41-45) Reed did not discover and could not have discovered the factual basis for any of his claims until September 2019 at the earliest. And he could not have

reasonably discovered the factual predicates for any of these claims sooner. Reed's claims are thus timely.

### C. If proven, the facts underlying Reed's claims establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty.

Finally, Reed has made a prima facie showing that clear and convincing evidence establishes that no reasonable juror would have voted to convict him had the state not committed the alleged constitutional violations. The question isn't whether Reed "is factually innocent," but whether "it is *reasonably likely* that, after hearing the new evidence alongside the old evidence, every reasonable juror would have some level of reasonable doubt." *Will*, 970 F.3d at 544, 547.

The answer to that question is "yes." But for the state's constitutional violations, the trial would have looked very different. *First*, the jury would have heard that Reed and Stites were acquainted—and "flirting," SA426—before the murder. *Supra* pp. 15-20. *Second*, the jury would have heard that Fennell was violent toward Stites, knew that she was having an affair with a Black man, and made inculpatory remarks at her funeral. *Supra* pp. 20-27. *Third*, the jury would have heard very different forensic testimony—meaning no evidence that Stites was sexually assaulted or that Reed's sperm was

deposited around the time of her death. *Supra* pp. 27-29. Each of those differences "would be sufficient" to produce reasonable doubt, 28 U.S.C. § 2244(b)(2)(B)(ii). Taken together, they dismantle the state's entire case against Reed. No reasonable juror, having heard all that evidence, would have believed that Reed was guilty of murder beyond a reasonable doubt.

> **1.** **But for the state's *Brady* and *Napue* violations, the jury would have heard that Reed and Stites were acquainted and flirting before the murder.**

**a.** Because of the state's constitutional violations, the jury never heard highly exculpatory evidence from Stites' coworkers that she and Reed had been acquainted, and even romantically involved, before the murder. Instead, it heard false testimony from investigators that nobody could corroborate Reed's defense, while the state failed to disclose that three of Stites' coworkers had told investigators about a connection between Stites and Reed. *Supra* pp. 16-17. Suzan Hugen had told Paul Alexander, a Bastrop police officer, that she had seen Stites and Reed together at HEB, SA486:12-19, and she testified at the 2021 hearing that it "seemed like more than a friendship," SA484:23. Prosecutors also had "witness interview summaries" indicating that Ron Haas and Andrew Cardenas "had heard rumors at HEB that [Reed] knew Stacey Stites." SA419. And the state solicited false

testimony from Alexander that he had little involvement in the investigation, even though he had written a memorandum about a potential suspect and was in possession of Hugen's key exculpatory information. *Supra* pp. 17, 19. The state also solicited false testimony from lead investigator Rocky Wardlow that the investigation had not uncovered "anybody that said [Stites] had been associated with Reed." SA34:24-SA35:11.

**b.** That exculpatory information, minus the investigators' false testimony, would have toppled one of the key pillars of the state's case. The state stressed at trial and in closing argument that investigators had looked everywhere, without success, for witnesses who could link Reed and Stites. *Supra* pp. 9-10. That narrative was crucial, because only without that evidence could the state argue that Reed's sperm necessarily meant that Reed abducted Stites and "raped and sodomized" her "at the time of [her] death." SA44:1-SA46:2. But Haas's and Cardenas's statements that there were rumors that Stites and Reed knew each other would have given jurors doubt about the state's stranger theory, and testimony from Hugen—*one of Stites' friends*—would have meant no reasonable juror could have believed the state's case.

Testimony about Reed and Stites from Hugen, Haas, Cardenas, and any other witnesses Reed could have identified based on their information would have been categorically different from the only evidence Reed was able to offer at trial about his relationship with Stites. The state tried to discredit the only two witnesses Reed called to corroborate that relationship because they were Reed's friends or acquaintances—and one even referred to Stites by the wrong first name. *Reed*, 670 S.W.3d at 707-08. But none of the witnesses the state failed to disclose, in contrast, had any connection to Reed—all were coworkers or friends of Stites.

> **2.** **But for the state's *Brady* violations, the jury would have heard evidence that Fennell acted violently toward Stites, knew about her affair with Reed, and had made inculpatory remarks after her death.**

**a.** Because of the state's *Brady* violations, Reed was unable to present evidence to the jury that strongly inculpated Fennell. William Sappington, Fennell and Stites' downstairs neighbor, had told both a police officer and a district attorney from Lee County (where Sappington lived) that Fennell and Stites fought all the time, that Fennell was "very aggressive" during those fights and screamed "very abusive language," SA509:6-10, and

that Sappington was "really concerned" for Stites' safety, SA502:21-23; *supra* pp. 21-22.

Two police officers also had inculpatory information about Fennell. Fennell had told Charles Wayne Fletcher that Stites was "fucking a n****r." SA440:10-25. And Fletcher was so disturbed by Fennell's "cold" behavior at Stites' funeral that he began to "question whether he was involved in [Stites'] death." SA399 ¶¶ 7-8. Similarly, Jim Clampit, heard Fennell say to Stites' body at the funeral that "she got what she deserved." SA449:3-16. Yet none of that information—known to a district attorney and police officers before the trial—was disclosed to Reed.

**b.** Any reasonable juror who had heard that testimony would have had reasonable doubt about Reed's guilt. Prosecutors said the couple had a happy relationship; they portrayed Fennell as a grief-stricken fiancé; and they told the jury that despite "look[ing] everywhere," "nobody could find anything inconsistent" with Fennell's testimony. SA60:11-16. But testimony from Sappington, Fletcher, and Clampit would have destroyed that narrative. It also would have ascribed a specific motive to Fennell, namely, that he was jealous and enraged that his wife was having an affair with a Black man—something Reed was unable to do without the undisclosed evidence.

And the testimony that Fennell told Stites' body that "she got what she deserved," SA449:3-16, is enough standing on its own to create reasonable doubt. What's more, with the evidence from Sappington, Fletcher, and Clampit, Reed's counsel might have discovered earlier the significant additional evidence inculpating Fennell that has only come to light since the trial. *Supra* pp. 24-27. Presented with that evidence, no reasonable juror could have found Reed guilty.

**3.   But for the state's *Napue* violations, the jury would not have heard false testimony that Stites was sexually assaulted and that Reed's sperm was deposited around the time of her death.**

**a.**   The state's solicitation of false forensic testimony misled the jury about crucial circumstances surrounding Stites' death—and the state needed the jury to believe those falsehoods to find that Reed was the killer. Karen Blakely, a crime scene investigator for the state, told the jury that "26 hours" is "the outside length of time" that sperm can survive intact. SA22:13-16. The state thus argued that Reed's sperm must have been deposited when Stites was murdered. SA44:25-SA45:12. And medical examiner Roberto Bayardo argued that Stites had rectal injuries that "occurred at the time of her death" from penetration that "would not have been consensual." SA39:6-SA40:13.

Blakely also testified that bruises on Stites' body were inflicted around when she died. SA14:24-SA16:6.

At the 2021 hearing, however, the state's experts agreed that all that testimony was false. Sperm can survive for *days*, and Blakely misrepresented a study to claim otherwise. *Supra* pp. 27-28. Likewise, there was no scientific basis for Bayardo's conclusion that Stites was anally penetrated (and thus, in Bayardo's view, sexually assaulted) at the time of her death. *Supra* pp. 28-29. And there was no way to conclude that Stites' bruises were inflicted then, either, because bruises cannot be reliably dated. *Supra* pp. 28-29.

**b.** Without that testimony, the prosecution would have lost its "smoking gun." SA48:11-17. The state emphasized at closing that "*because* [Reed's sperm] got there at the time that it did, that leads you directly to [Stites'] killer." *Id.* (emphasis added). Prosecutors also told the jury that Stites was abducted and that she was "raped and sodomized" "at the time of her death." SA44:1-SA46:2. But without Blakely's and Bayardo's false testimony, the state could not have proven that Reed and Stites had sex at the time of the murder or that it was nonconsensual. The state's experts now acknowledge that it could have been days before and that there's no evidence of nonconsensual penetration. *Supra* pp. 27-28.

Thus, the *only* physical evidence linking Reed to Stites would have become significantly less inculpatory—if inculpatory at all. All the jury could have inferred from Reed's sperm is that he and Stites had sex at some point in the days before her death. Without any timeline connecting that possibly consensual sex to the murder, the prosecution couldn't have eliminated reasonable doubt—especially given the evidence the jury would have heard, but for the other *Brady* violations, that Reed and Stites were in a relationship.

> **4.** **But for each of the constitutional violations, no reasonable juror would have convicted Reed; but for all of the violations, the state would have had no case left.**

Any one of the *Brady* or *Napue* claims in Reed's proposed second petition establishes that no reasonable juror would have lacked reasonable doubt but for constitutional error. *See* 28 U.S.C. § 2244(b)(2)(B)(ii). But all the claims together would have left the state without a case. *See Jackson v. Brown*, 513 F.3d 1057, 1076 (9th Cir. 2008) (explaining that a court "must analyze *Brady* and *Napue* violations 'collectively'"); *accord Kopycinski v. Scott*, 64 F.3d 223, 226 (5th Cir. 1995). But for all those constitutional violations, the state couldn't have convinced the jury that Reed and Stites were strangers or that Reed sexually assaulted Stites (much less at the time she died). Nor could it have escaped the significant evidence that *Fennell* killed Stites.

Indeed, those changed premises reinforce each other and collectively exculpate Reed and inculpate Fennell. For example, the evidence that Reed and Stites were "flirting" before the murder, SA426, on its own, discredits the state's theory of the crime—that Reed was a stranger who must have raped Stites. And Fennell's comment to Fletcher that Stites was "fucking a n****r," SA440:10-25, standing alone, shows that Fennell had a motive. But taken *together*, those two pieces of evidence fundamentally change the case, suggesting that Fennell murdered Stites *because of* her relationship with Reed. And given that evidence that Reed and Stites were in a relationship, if the jury also had not heard the false forensic testimony that Reed's sperm must have been deposited around the time of Stites' death, there would no longer be *any* physical evidence that Reed committed the crime. All the state could have proven was that Reed and Stites—who had been having an affair—had sex sometime in the days before her murder. That's not a reasonable basis to convict.

At the very least, Reed has made a sufficient prima facie showing and demonstrated that it's "reasonably likely" that any juror would have reasonable doubt in light of this new evidence. *Will*, 970 F.3d at 547.

**D.** **Reed's claims will succeed on the merits—although he need not make that showing at this stage.**

As explained (at 36-38), the Court "assume[s] the merits of" the "asserted constitutional error at this stage," so resolving this motion doesn't turn on whether Reed's underlying claims will ultimately succeed. *Swearingen*, 556 F.3d at 348. Still, Reed submits that his *Brady* and *Napue* claims will succeed, and the CCA's decisions rejecting those claims will not be entitled to deference under 28 U.S.C. § 2254(d), if this Court authorizes the district court to review the proposed second petition.

**1.** **Reed's *Brady* claims will succeed.**

**a.** "[S]uppression by the prosecution of evidence favorable to an accused … violates due process," *Brady*, 373 U.S. at 87, when that evidence is "material to guilt or punishment," *Floyd v. Vannoy*, 894 F.3d 143, 154 (5th Cir. 2018). Accordingly, a prosecutor "has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995). And the failure to disclose exculpatory evidence violates *Brady* whether it is "willful[] or inadvertent[]." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). For evidence to be material under *Brady*, "there must be 'a reasonable probability that, had

the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *United States v. Brumfield*, 89 F.4th 506, 513-14 (5th Cir. 2023). "[M]ateriality of 'suppressed evidence is considered collectively, not item by item.'" *Floyd*, 894 F.3d at 162 (quoting *Kyles*, 514 U.S. at 436).

**b.**     The state suppressed material evidence that was highly favorable to Reed. *Supra* pp. 16-17, 20-23, 48-52. Indeed, the state admits that the prosecutors had "witness interview summaries" containing the exculpatory information Cardenas and Haas had conveyed. SA419. And Hugen and Sappington had conveyed exculpatory information to police officers or a district attorney. *Supra* pp. 17, 22. Fletcher and Clampit themselves *were* police officers. The state thus had a duty to disclose that exculpatory information. *See Kyles*, 514 U.S. at 437-38. But it never did.

As explained (at 48-52), the *Brady* evidence was favorable to Reed and material. Indeed, because the *Brady* materiality standard (a "reasonable probability" that the "result of the proceeding would have been different," *Brumfield*, 89 F.4th at 513-14) is far less onerous than the § 2244(b)(2)(B)(ii) standard ("clear and convincing evidence that … no reasonable factfinder would have found the applicant guilty," 28 U.S.C. § 2244(b)(2)(B)(ii)), it

follows that if Reed has satisfied the § 2244(b) standard, he has satisfied the *Brady* favorable-evidence and materiality prongs, too.

### 2. Reed's *Napue* claims will succeed.

**a.** "[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment." *Napue*, 360 U.S. at 269. The same is true "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.* To establish a *Napue* violation, a petitioner must prove: "(1) the witness testified falsely; (2) the government knew the testimony was false; and (3) the testimony was material." *United States v. Brumfield*, 89 F.4th 506, 519 (5th Cir. 2023).

Materiality under *Napue* means a "'reasonable probability' of a different outcome … so as to undermine confidence in the verdict." *Id.* And, as with *Brady* claims, courts assess materiality by "examin[ing] the challenged evidence collectively, not on an item-by-item basis." *United States v. O'Keefe*, 128 F.3d 885, 894 (5th Cir. 1997).

As to the knowledge element, this Court has held that a new trial is warranted "if the government used false testimony and knew *or should have known* of its falsity." *United States v. MMR Corp.*, 954 F.2d 1040, 1047 (5th Cir.

1992) (emphasis added). And at least two courts of appeals have likewise held that "knowingly false or misleading testimony by a law enforcement officer is imputed to the prosecution." *Boyd v. French*, 147 F.3d 319, 329 (4th Cir. 1998); *accord Wedra v. Thomas*, 671 F.2d 713, 717 n.1 (2d Cir. 1982). *But see Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (declining, without discussion, to impute knowledge of false testimony from a police officer to a prosecutor).

**b.** The challenged testimony was false, prosecutors or law-enforcement officers knew or should have known that, and the testimony was material.

Start with falsity. Alexander lied about the extent of his involvement in the case. *Supra* p. 19. Wardlow testified falsely about whether the state had uncovered evidence of a connection between Stites and Reed, *supra* p. 20, and prosecutors failed to correct that false testimony, *see Napue*, 360 U.S. at 269. And the state's own experts admitted at the 2021 hearing that forensic testimony offered at the trial was false. *Supra* pp. 27-29.

The prosecutors knew or should have known that testimony was false. The state's files indicated that Alexander was more involved in the investigation than he said at trial, SA724, and contradicted Wardlow's testimony

that the investigation into Reed and Stites' connection had turned up nothing, SA419-SA423. And the state's experts at the 2021 hearing agreed that Blakely had misrepresented the study she relied on to conclude that sperm could not survive for more than 26 hours. *Supra* pp. 27-28. If those experts know that testimony is false now (based on a study that Blakely had), there's no reason why Blakely and prosecutors at the 1998 trial should not have known that testimony was false then. The same is true for the other false forensic testimony. *Supra* pp. 28-29. What's more, all the false forensic testimony was provided by state investigators or medical examiners, so even if *prosecutors* didn't know the testimony was false, the *witnesses'* knowledge of its falsity is imputed to the prosecutors. *Boyd*, 147 F.3d at 329.

Finally, Reed has shown (at 52-55) why, but for this false testimony—considered alongside the *Brady* violations, *see Jackson*, 513 F.3d at 1076—any reasonable juror would have voted to acquit. Again, because that § 2244(b) showing is more onerous than the *Napue* materiality standard, Reed necessarily satisfies the *Napue* standard. *Supra* pp. 57-58.

### 3. The CCA's resolution of Reed's claims is not entitled to deference under 28 U.S.C. § 2254(d).

At this stage, the Court doesn't review the merits of Reed's claims, but decides only whether Reed satisfies § 2244(b). For context, however, Reed submits that the CCA's resolution of the claims in the proposed second petition isn't entitled to deference under § 2254(d). That provision bars habeas relief "with respect to any claim that was adjudicated on the merits in State court proceedings" unless the state-court decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Section 2254(d) is no obstacle to habeas relief here.

*First*, at least two of Reed's claims—the *Brady* violation concerning Sappington's exculpatory evidence and the *Napue* violation regarding the false forensic testimony—were not "adjudicated on the merits," *id.*, in state court, because the CCA dismissed them as procedurally barred under state law. *See Reed*, 2023 WL 4234348 at *5-8. So § 2254(d) does not require deference, and review is de novo. *Fisher v. Texas*, 169 F.3d 295, 299-300 (5th Cir.

1999). And because Reed has shown under § 2244(b) that, but for constitutional error, no reasonable juror would have voted to convict him, "[a] federal court may invoke the miscarriage of justice exception to justify consideration of claims defaulted in state court." *McQuiggin v. Perkins*, 569 U.S. 383, 394 (2013). The "miscarriage of justice" standard, described in *Schlup v. Delo*, 513 U.S. 298, 326-27 (1995), is *less burdensome* than the § 2244(b) standard. *See McQuiggin*, 569 U.S. at 395-97. So Reed's satisfying the latter necessarily means he satisfies the former.

*Second*, the CCA's decisions—and the state trial court decision that preceded them—rested on "an unreasonable determination of the facts." 28 U.S.C. § 2254(d)(2). The trial court heard evidence from 47 witnesses and adopted the state's proposed findings of fact and conclusions of law verbatim—finding Fennell and all of the state's witnesses credible and none of Reed's witnesses credible. *Supra* pp. 13-14. The CCA noted that those findings were filled with errors, *Reed*, 670 S.W.3d at 744 & n.8, but nonetheless deferred to the trial court on key credibility determinations (including regarding Fletcher) because the trial judge "observ[ed]" the "testimony and demeanor firsthand," *id.* at 765. Reed will show in district court that the CCA's decision not to credit his evidence was unreasonable. And that's to

say nothing of other legal or factual errors in the CCA's decisions, which would also strip deference under § 2254(d)(1) or § 2254(d)(2)—but all of that is for further exploration in the district court if this Court grants Reed's motion.

# CONCLUSION

The Court should grant this motion to authorize the district court to consider Reed's second petition for a writ of habeas corpus.

Dated: June 28, 2024

Respectfully submitted,

*/s/ Parker Rider-Longmaid*

Jeremy Patashnik
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
One Manhattan West
New York, NY 10001

Raza Rasheed
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
300 South Grand Ave., St. 3400
Los Angeles, CA 90071

Barry C. Scheck
Jane Pucher
THE INNOCENCE PROJECT
40 Worth St., Ste. 701
New York, NY 10013

George Kendall
Nicola Cohen
SQUIRE PATTON BOGGS (US) LLP
1211 Ave. of the Americas, 26th Fl.
New York, NY 10036

Parker Rider-Longmaid
    *Counsel of Record*
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
1440 New York Ave., NW
Washington, DC 20005
Telephone: 202-371-7000
parker.rider-longmaid@skadden.com

Cliff C. Gardner
Sarah Runnells Martin
Michelle L. Davis
Gregory P. Ranzini
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
920 N. King St.
Wilmington, DE 19801

Andrew F. MacRae
MACRAE LAW FIRM PLLC
3267 Bee Cave Rd., Ste. 107, PMB 276
Austin, TX 78746

*Counsel for Movant Rodney Reed*

## CERTIFICATE OF COMPLIANCE

I hereby certify that (1) this motion complies with the type-volume limitation of Fifth Circuit Rule 22 and Federal Rule of Appellate Procedure 32(a)(7) because, as calculated by Microsoft Word, it contains 12,981 words, excluding the parts of the motion exempted by Federal Rule of Appellate Procedure 32(f), and (2) this motion complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in a 14-point Book Antiqua font.

Dated: June 28, 2024          */s/ Parker Rider-Longmaid*
                                    Parker Rider-Longmaid

                                    *Counsel for Movant Rodney Reed*

## CERTIFICATE OF CONFERENCE

I hereby certify that, pursuant to Fifth Circuit Rule 27.4, I conferred on June 26, 2024, about this motion with Travis Bragg, counsel for Respondent, the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice, who represents Texas in federal habeas proceedings. Mr. Bragg informed me that the Director opposes this motion and intends to file a response in opposition.


Dated: June 28, 2024

*/s/ Parker Rider-Longmaid*
Parker Rider-Longmaid

*Counsel for Movant Rodney Reed*

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2024, I electronically filed this motion with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I also certify that, on June 28, 2024, I caused this motion to be sent via email to Travis Bragg, counsel for Respondent, the Director of the Correctional Institutions Division of the Texas Department of Criminal Justice.

Dated: June 28, 2024                    */s/ Parker Rider-Longmaid*
                                        Parker Rider-Longmaid

                                        *Counsel for Movant Rodney Reed*